UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**SHANNON M. GILMORE,**

          **Plaintiff,**

      -v-           **7:15-CV-837 (NAM)**

**COMMISSIONER OF SOCIAL SECURITY,**

          **Defendant.**

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

APPEARANCES:

Peter L. Walton, Esq.
Conboy, McKay Law Firm
407 Sherman Street
Watertown, New York 13601
Attorney for Plaintiff

Elizabeth D. Rothstein, Esq.
Social Security Administration
Office of General Counsel
26 Federal Plaza, Room 3904
New York, New York 10278
Attorneys for Defendant

**Hon. Norman A. Mordue, Senior District Judge:**

## MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

On August 16, 2012, plaintiff filed an application for disability insurance benefits, alleging an onset date of December 23, 2008, due to fibromyalgia, cervical spondylosis, lumbar spine dysfunction, mood disorder with depression, bipolar disorder with anxiety, panic disorder and severe headaches. The application was initially denied on November 20, 2012. Thereafter, plaintiff filed a request for a hearing, and a hearing was held on December 12, 2013. On February 10, 2014, ALJ Jennifer Gale Smith issued a decision denying plaintiff's claim for benefits. (Tr.89-103). The Appeals Council denied plaintiff's request for review. Plaintiff brought an action

pursuant to 42 U.S.C. § 405(g) of the Social Security Act, asking the court to reverse the Commissioner's decision to deny her application for disability benefits.

Presently before the court are the parties' cross-motions for judgment on the pleadings. (Dkt. Nos. 9, 10). For the reasons set forth below, the court concludes that the Commissioner's decision should be affirmed.

## DISCUSSION

### A. Legal Standard

The Social Security Act authorizes payment of disability insurance benefits or SSI benefits to individuals with "disabilities." To be considered disabled, a plaintiff must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1832c(a)(3)(A). The Commissioner uses a five-step process to evaluate disability insurance and SSI disability claims:

> [I]f the Commissioner determines (1) that the claimant is not working, (2) that he has a "severe impairment," (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000).

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw*,

-2-

221 F.3d at 131. Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

**B.     ALJ's Decision**

First the ALJ found that plaintiff, who was born July 1, 1975, had not engaged in substantial gainful activity since the alleged onset date. (Tr. 94). Discussing the medical evidence in detail, the ALJ then concluded that plaintiff had the following "severe impairments:" fibromyalgia, cervical spondylosis without spinal cord compression, lumbar spine dysfunction with levoscoliosis, mood disorder with depression, bipolar disorder with anxiety and panic disorder without agoraphobia. (Tr. 94-98). The ALJ also discussed plaintiff's allegation that she suffered from headaches, specifically, migraines for years, seemingly triggered by stress. (*See* Tr. 96). However, the ALJ concluded that these headaches, her left elbow cubital tunnel syndrom, hypothyroidism and GERD are not severe impairments as they have not "more than minimally adversely affected her ability to engage in work activity." (Tr. 98). The ALJ then concluded that the criteria of Listings 1.04, 12.04 and 12.06 had not been met. (Tr. 98-99).

Next, the ALJ discussed the evidence and found that plaintiff had "the residual functional capacity to perform sedentary work . . . except she only occasionally can balance, stoop, crouch, kneel, crawl and reach. She frequently can handle and finger. She never can climb ladders, ropes or scaffolds." With respect to plaintiff's mental capacity, the ALJ concluded that she "can perform simple routine and repetitive tasks. She should work in a low stress environment (defined as one involving occasional decision-making, occasional changes in the work setting and one requiring

-3-

occasional judgment). She can have occasional contact with coworkers, supervisors and the public." (Tr. 99).

Dr. Lorenson consultatively examined plaintiff on November 2, 2012. The ALJ discussed this opinion that plaintiff had only moderate limitations in bending, lifting and reaching. (Tr. 99). The ALJ afforded "great" evidentiary weight to the limitations found by Dr. Lorenson because "they are consistent with the longitudinal evidence." The ALJ further noted, with respect to plaintiff's physical limitations, that Dr. Patel, plaintiff's treating physician, referred plaintiff for a residual functional capacity evaluation and did not express any opinion regarding her physical and mental work abilities and limitations. (Tr. 101). The ALJ did discuss Dr. Patel's examinations of plaintiff, noting that on May 19, 2011, she was on Neurontin for fibromyalgia which was fairly stable, that he assessed anxiety/depression with panic disorder and started her on Zoloft and Ativan. The ALJ further noted that on June 30, 2011, plaintiff reported improvement on these medications to Dr. Patel. (Tr. 95-96). On January 19, 2012, plaintiff reported significant improvement in her pain, but stated that she still had some lower back pain at times and shoulder pain. (Tr. 96). On September 20, 2012, plaintiff's fibromyalgia had gotten worse with weakness and pain, she had numbness and tingling in her left arm, and pain randomly throughout her body, but no other concerns. Dr. Patel increased the dose of Neurontin and ordered a cervical and cranial MRI to rule out other etiologies. On October 11, 2012, the increased dose of Neurontin had helped. (Tr. 96). On April 22, 2013, Dr. Patel referred plaintiff for an MRI of the cervical spine. The MRI identified cervical spondylosis at the C3-4, C6-7 and C7-T1 levels without spinal cord compression. (Tr. 97).

With respect to her mental impairments, the ALJ discussed the opinion of consultative

examiner Dr. Oman, who advised that plaintiff could follow simple directions, perform simple tasks independently, maintain attention and concentration, learn new tasks, perform complex tasks (with supervision due to lack of confidence), and make appropriate decisions; and that she could not maintain a regular schedule, relate to others, or manage stress appropriately. (Tr. 100). The ALJ then noted that state agency medical record review psychiatrist Dr. Tzetzo opined that Dr. Oman's assessment was only partly supported by the record, further opining that plaintiff retained the ability to perform work and her ability to deal with coworkers and the public, although somewhat reduced, was adequate to handle brief and superficial contact. (Tr. 100). Dr. Tzetzo concluded that plaintiff's symptoms only presented mild limitation of daily living activities, moderate difficulty maintaining social functioning and moderate difficulty maintaining concentration, persistence or pace. (Tr. 98). The ALJ assigned "little weight" to Dr. Oman's assessment "because it was based on a one-time evaluation and was not consistent with the longitudinal evidence." (Tr. 101). The ALJ, on the other hand, assigned "great weight" to the assessment of Dr. Tzetzo "because it was based on a review of the longitudinal evidence." (Tr. 101).

The ALJ concluded that while plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of the symptoms are not entirely credible. The ALJ observed that her "testimony suggests very limiting symptoms, but her statements made to those treating her consistently reflect an opinion that medication, after dose adjustment, was successfully managing the symptoms." (Tr. 101).

The ALJ then found that plaintiff was unable to perform her past relevant work, as it was

-5-

classified as a skilled job requiring light exertion. Because plaintiff did not have the ability to perform the full range of sedentary work, the ALJ consulted a vocational expert. The vocational expert testified that plaintiff would be able to perform the requirements of a Bonder, SVP 2, an unskilled job requiring sedentary exertion with 20,620 jobs in the nation. (Tr. 102). The ALJ noted that the VE only identified one job that could be performed, but that 20,620 jobs in the national economy is a significant number of jobs. (Tr. 102). Consequently, the ALJ concluded that plaintiff had not been under a disability from December 23, 2008 through the date of the decision.

### C. Issues In Contention

Plaintiff argues that: (1) the ALJ erred by failing to find plaintiff's headaches to be a severe impairment; (2) the ALJ erred by failing to conclude that plaintiff's impairment meets Listing 1.04; (3) the ALJ's RFC determination is not supported by substantial evidence; and (4) the decision failed to determine that there are jobs in significant numbers in the national economy that plaintiff can perform.

#### 1. Severe Impairment

The Court concludes that the ALJ appropriately determined that plaintiff's headaches were not a "severe" impairment. The claimant bears the burden of presenting evidence establishing severity at Step 2 of the disability analysis. *Briggs v. Astrue*, No. 5:09-CV-1422 (FJS/VEB), 2011 WL 2669476, at *3 (N.D.N.Y. Mar. 4, 2011) (Report-Recommendation), adopted, 2011 WL 2669463 (N.D.N.Y. July 7, 2011). A severe impairment is one that significantly limits the plaintiff's physical and/or mental ability to do basic work activities. See 20 C.F.R. § 404.1520(c); see also 20 C.F.R. § 404.1521(a) (noting that an impairment is not severe at Step 2 if it does not

significantly limit a claimant's ability to do basic work activities). The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include, (1) physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). It is quite clear from these regulations that "severity" is determined by the limitations imposed by an impairment, and not merely its by diagnosis. The "presence of an impairment is . . . not in and of itself disabling within the meaning of the Act." *Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995) (citations omitted).

An ALJ should make a finding of "'not severe' . . . if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3). The Second Circuit has held that the Step 2 analysis "may do no more than screen out de minimis claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). If the disability claim rises above a de minimis level, then the remaining analysis of the claim at Steps 3 through Step 5 must be undertaken. *Id*. at 1030.

As defendant notes, the majority of the evidence mentioned by plaintiff in support of this argument post-dates the ALJ's decision. Such newly submitted evidence is evaluated to determine whether it relates to the relevant period and whether the ALJ's decision is contrary to the weight of the evidence, but does not warrant remand provided it "does not add so much as to make the ALJ's decision contrary to the weight of the evidence." *Rutkowski v. Astrue* 368 F. App'x 226, 229 (2d

Cir. 2010). The Court concludes that the new evidence relating to plaintiff's headaches does not make the ALJ's decision contrary to the weight of the evidence. The ALJ discussed plaintiff's headaches, and the medical evidence regarding these headaches, but concluded that they did not rise to the level of a "severe impairment." The record fails to establish any additional limitations stemming specifically from plaintiff's headaches.

Moreover, often when there are multiple impairments, and the ALJ finds some, but not all of them severe, an error in the severity analysis at Step 2 may be harmless because the ALJ continued with sequential analysis and did not deny the claim based on the lack of a severe impairment alone. *Tryon v. Astrue*, No. 5:10-CV-537, 2012 WL 398952, at \*3 (N.D.N.Y. Feb. 7, 2012) (citing *Kemp v. Commissioner of Soc. Sec.*, No. 7:10-CV-1244, 2011 WL 3876526, at \*8 (N.D.N.Y. Aug. 11, 2011)). This is particularly true because the regulations provide that combined effects of all impairments must be considered, regardless of whether any impairment, if considered separately, would be of sufficient severity. 20 C.F.R. §§ 404.1523, 416.923; *Dixon*, 54 F.3d at 1031. Here, especially in light of the fact that the ALJ did consider and discuss plaintiff's headaches, the Court concludes that any error in not finding plaintiff's headaches "severe" would be harmless.

### 2. Listing 1.04

At the third step in the disability analysis, the ALJ determines whether a claimant's impairments meet the criteria of any of the impairments listed in Appendix 1 of the SSA regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. These impairments are "acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment," and therefore, if a claimant's impairment meets or equals a listed impairment, she is conclusively presumed to be

-8-

disabled. *See DiPalma v. Colvin*, 951 F. Supp. 2d 555, 570 (S.D.N.Y. 2013) (citation omitted). "For a claimant to show that his impairment matches a listing, [the impairment] must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

Here, plaintiff argues that she meets the requirements of Listing 1.04. Listing 1.04 provides:

> Disorders of the spine (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equine) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
> or
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once ever 2 hours;
> or
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Listing 1.00B2b provides as follows:

> The inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

Although plaintiff contends that she meets the requirements of this listing as a result of her cervical spondylosis, as the Commissioner observes, she fails to point to evidence of motor loss accompanied by sensory or reflex loss related to her cervical spine as required by the Listing. Plaintiff points to a November 26, 2013 exam which showed C6 and C8 sensory impairment; reflex loss on both sides; and limited motion of the spine, with pain. This exam also showed normal (2/4) reflexes, and full (5/5) motor strength. (Tr. 515-18). An April 22, 2013 examination by Dr. Patel demonstrated full power in upper extremities, and on June 25, 2013, plaintiff denied weakness in her upper extremities. Dr. Patel also noted on June 25, 2013, that the cervical spine MRI showed no cord compression.

### 3. RFC Determination

Plaintiff argues that the ALJ erred by not making a specific function-by-function analysis, and that the RFC determination is not supported by the record. A plaintiff's RFC is the most he can do despite his limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. "A regular and continuing basis means eight hours a day, for five days a week, or an equivalent work schedule." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (citation omitted). In determining RFC, the ALJ can consider a variety of factors, including a treating physician's or examining physician's observations of limitations, the claimant's subjective allegations of pain, physical and mental abilities, as well as the limiting effects of all impairments. 20 C.F.R. § 404.1545(a).

The ALJ's RFC finding incorporated limitations on the full range of sedentary work based

on plaintiff's impairments.

According to the applicable regulations:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a) & 416.967(a). The ALJ found that plaintiff can only occasionally balance, stoop, crouch, kneel, crawl, and reach; can frequently handle and finger; and can never climb ladders, ropes, or scaffolds. The Court finds that the ALJ considered, with appropriate specificity, plaintiff's ability to perform the various functions associated with sedentary work.[1] While plaintiff argues that Dr. Lorenson, whose opinion the ALJ relied on for her physical limitations, did not address plaintiff's ability to lift or durational limits for sitting, standing, and walking, instead only finding that plaintiff had moderate restrictions for bending lifting and reaching. The Court notes that a review of Dr. Lorenson's examination provides no indication that plaintiff had any further limitations. (Tr. 441-44). Discussing her daily activities, Dr. Lorenson noted that she cooks, cleans, does laundry, shops, and does childcare (but not too often because it hurts), showers and dresses herself on a daily basis, watches TV and reads. Dr. Lorenson further found that she appeared to be in no acute distress, her gait was normal, she could walk on heels and toes without difficulty, her squat was full, her stance was normal, she used no assistive

---

[1] Moreover, even assuming that he had not, the Second Circuit has held that failure to perform a function by function analysis is not a per se error requiring remand where the ALJ's analysis affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous. *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

devices, she needed no help changing for the exam or getting on and off the exam table, and she was able to rise from the chair without difficulty. He further found that her cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. He found no scoliosis, kyphosis, or abnormality in the thoracic spine. He found the lumbar spine shows flexion to 70 degrees, extension 20 degrees, lateral flexion 20 degrees bilaterally, and rotary movement 30 degrees bilaterally. The straight leg raise test was negative bilaterally. She had full range of motion of her shoulders, elbows, forearms, and wrists bilaterally. She also had full range of motion of her hips, knees, and ankles bilaterally. Strength was 5/5 in the upper and lower extremities. (Tr. 441-44). Dr. Lorenson's opinion that plaintiff had only moderate restrictions in bending, lifting, and reaching, was supported by his examination, as described above, and the longitudinal evidence. There is substantial evidence in the record to support the ALJ's determination that plaintiff's impairments do not preclude her from performing a reduced range of sedentary work–lifting no more than 10 pounds, sitting most of the time (approximately six hours total), and standing and walking occasionally (approximately two hours total).

The Court also concludes that substantial evidence supports the ALJ's decision to assign great weight to Dr. Tzetzo's assessment, and little weight to that of Dr. Oman. As an initial matter, plaintiff argues that if Dr. Tzetzo was a single decision maker, and not a doctor, her opinion does not deserve any weight. However, as pointed out by the Commissioner, Dr. Tzetzo is a psychiatrist, not a single decision maker. The ALJ concluded that Dr. Oman's opinion, which was based on a one time examination, on November 2, 2012, was not consistent with the longitudinal evidence. Dr. Oman did find that plaintiff could follow simple directions and perform simple tasks independently; maintain attention and concentration; learn new tasks; perform

complex tasks with supervision because she lacked confidence; and make appropriate decisions. Dr. Oman opined, on the other hand, that plaintiff could not maintain a regular schedule, relate to others because she was very self-conscious, and could not appropriately manage stress. (Tr. 445-49). There is nothing in Dr. Oman's examination, or anywhere in the record, to support an inability to relate to others, maintain a regular schedule, or appropriately manage stress. For example, Dr. Oman's examination revealed that plaintiff was cooperative, her manner of relating was adequate, and her eye contact was appropriate. (Tr. 447). Similarly, at a mental status exam in August 2012, plaintiff was cooperative, had a normal rate of speech, expressive language was within normal limits, her appearance and hygiene were normal, her affect was of full range, her mood was euthymic, she was oriented to time, day, date, person, situation, and place, and she was attentive. (Tr. 416). On July 31, 2012, it was reported that plaintiff's strengths are that she "likes to meet new people and try new things." (Tr. 432). Additionally, plaintiff was able to go outside alone, shopped, used public transportation, and took her son to school. In July 2012, plaintiff reported that she was employed full time, working 30 hours per week. (Tr. 430). Later, in April 2013, she reported that she continues to participate in college, was doing well in her courses, and had begun to participate in couponing with some of her friends. (Tr. 496). In July 2013, she continued to do well in college despite her physical pain, and was utilizing her support system, such as her mother and a good friend. (Tr. 503). The Court agrees that the longitudinal evidence is not consistent with Dr. Oman's opinion, and, contrary to plaintiff's assertion, does support the opinion of Dr. Tzetzo who assessed that plaintiff retained the capacity to work despite a somewhat reduced ability to deal with coworkers and the public.

      The Court concludes that the ALJ's RFC finding is supported by substantial evidence.

### 4.     Step 5 - Number of Jobs

If a claimant is unable to perform a full range of a particular exertional category of work, or the issue is whether a claimant's work skills are transferable to other jobs, then the ALJ may utilize the services of a vocational expert. 20 C.F.R. § 404.1566, 416.966. A vocational expert may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations. *See Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

Here, plaintiff claims that the number of jobs to which the VE testified is not a "significant number" of jobs, and therefore, plaintiff is disabled. The VE concluded, based on the ALJ's hypothetical, that plaintiff could perform the position of a bonder semiconductor, DOT code 726.685-066, a sedentary position with a SVP of two. The number of jobs nationally was 20,620. (Tr. 132).

Courts have held that the vocational expert need only show one *type* of job, so long as that job exists in significant numbers in the national or regional economy. *See Bavaro v. Astrue*, 413 F. App'x 382, 384 (2d Cir. 2011) (holding that the Commissioner need only show one job existing, but explaining "[a] vocational expert testified to the existence of such jobs at the national and regional level"). Courts have held that a "significant number" of jobs is "fairly minimal." *Rosa v. Colvin*, No. 3:12-CV-170, 2013 WL 1292145, at *9 (N.D.N.Y. Mar. 27, 2013) (citation omitted). "Neither the Social Security Act, nor the Commissioner's Regulations or Rulings provide a definition for a 'significant'' number of jobs." *Koutrakos v. Colvin*, No. 3:13-CV-1290, 2015 WL 1190100, at *21 (D. Conn. Mar. 16, 2015). The court is, therefore, generally guided by numbers that have been found "significant" in other cases. *Id.*

Courts have found that numbers less than the 20,620 nationally testified to by the vocational expert in this case to be significant. *See Gray v. Colvin*, No. 12-CV-6485, 2014 WL 4146880, at *6 (W.D.N.Y. Aug. 19, 2014) (60 jobs regionally, 16,000 nationally); *Vining v. Astrue*, 720 F. Supp. 2d 126, 136 (D. Me. 2010) (finding that 11,000 nationwide was a "significant number in several other regions of the country" and estimating that "numbers of jobs in the ballpark of 10,000 to 11,000 nationwide have been held significant."). The Court concludes that although the vocational expert only testified to one *type* of job that plaintiff could perform, he testified to there being 20,620 jobs in the national economy, which the Court finds "significant."

**CONCLUSION**

For these reasons, it is therefore

ORDERED that the Commissioner's motion for judgment on the pleadings (Dkt. No. 10) is GRANTED; and it is further

ORDERED that plaintiff's motion for judgment on the pleadings (Dkt. No. 9) is DENIED; and it is further

ORDERED that the Clerk of the Court is directed to enter judgment for the Commissioner.

IT IS SO ORDERED.

Date:    July 29, 2016

Norman A. Mordue
Senior U.S. District Judge